UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| STACY GUSE, | ) | CIV. 08-4119-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING IN PART |
| UNIVERSITY OF SOUTH DAKOTA; | ) | AND DENYING IN PART |
| TERI BELLIS, acting in her | ) | DEFENDANTS' SUMMARY |
| individual and official capacities; | ) | JUDGMENT MOTIONS |
| KAREN OLMSTEAD, acting in her | ) | |
| individual and official | ) | |
| capacities; and | ) | |
| MARNI JOHNSON, acting in her | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Stacy Guse, filed suit against defendants, Professor Teri Bellis,

Ph.D., Professor Marni Johnson, Ph.D., and University of South Dakota's

Graduate School Dean Karen Olmstead, Ph.D., in their individual and official

capacities and the University of South Dakota (USD), alleging violations of her

substantive and procedural due process rights and retaliation in violation of

the First Amendment under 42 U.S.C. § 1983. Guse also alleges state-law

claims of breach of contract and negligent infliction of emotional distress. She

seeks actual and punitive damages. Defendants move for summary judgment

on all claims. Additionally, Dean Olmstead, Dr. Bellis, and Professor Johnson

move for summary judgment on the individual capacity claims based on

qualified immunity. Guse resists the motions. The motions are granted in part and denied in part.

## BACKGROUND

In the light most favorable to Guse, the nonmoving party, the facts are as follows: Guse began an audiology clinical doctoral program at USD in the fall of 2005, which is offered through USD's Department of Communication Disorders (DCOM). It was the program's first year and Guse was one of five enrolled students.

All first-year graduate audiology students must complete twenty-five hours in USD's hearing clinic under faculty members' supervision. First-year students are paired with senior clinicians and Guse was paired with Amy Mattheis. Mattheis reported to Professor Johnson, the clinic director, that Guse overstepped her role as a first-year student because Guse gave her recommendations to patients even though the role of a first-year student is limited to observation. Guse disputes that Mattheis made the alleged report to Professor Johnson. Professor Johnson gave Guse a failing grade for the clinic course. Before receiving her final grade, no instructor had told Guse that she was violating American Speech-Language Hearing Association's (ASHA) ethics by providing her personal opinions to clinic patients.

On November 1, 2005, per Guse's request, hearing tests were performed on Guse's daughter, L.M., at USD's clinic. Dr. Bellis supervised the testing. Guse requested a copy of L.M.'s audiogram after the evaluation.

2

Defendants claim that Dr. Bellis told Guse that she could not give Guse the results until certain correction factors were completed and that she was ethically unable to recommend hearing aids until the conclusion of the follow-up appointment. Guse denies that any ethical obligations were referenced and states that Dr. Bellis did not provide the audiogram report because it was in rough form. Dr. Bellis told Guse that she could request the report in writing and that the Heath Insurance Portability and Accountability Act of 1996 (HIPPA) required the clinic to comply with her request within a limited period of time.

Later, Guse saw Cassie Torgerson (now Billiet), an upper-level student, in the hallway and inquired about obtaining a copy of L.M.'s audiogram results so that Guse could take the report with her to a November 8, 2005, appointment with Sioux Falls otolaryngologist Dr. DeSautel. Billiet had participated in L.M.'s testing and she worked as Dr. Bellis's graduate assistant. Billiet told Guse that as L.M.'s mother Guse could have a copy of everything in her daughter's file. Billiet showed Guse the location of Guse's daughter's medical files and Billiet handed the file to Guse. Guse copied the file and placed the original back in Billiet's student folder. Defendants dispute these facts and contend that Billiet did not give Guse permission to access or copy L.M.'s file. Instead, Billiet claims that she saw Guse enter the file room without her permission and that she reported it to Dr. Bellis because of HIPPA and USD's strict policies on patient confidentiality. Dr. Bellis later

3

removed L.M.'s file from the patient file room and put it in a locked drawer in her office.

Guse took L.M. to her appointment with Dr. DeSautel. Another clinic faculty member, Paul Brueggeman, Ph.D., later received medical clearance from Dr. DeSautel to fit L.M. for hearing aids.

Dr. Bellis scheduled a follow-up appointment with Dr. Brueggeman for November 29, 2005, at a time when Dr. Bellis's evaluative report would be in final form. Dr. Bellis was unexpectantly out of the office due to a death in the family on November 16 and 17. During this time, Guse contacted Dr. Brueggeman to discuss L.M.'s case and order hearing aids. When Guse met with Dr. Brueggeman and a senior clinician, Dr. Brueggeman could not find L.M.'s file because, unknown to clinic staff, it was locked in Dr. Bellis's office. On November 21, 2005, Dr. Brueggeman e-mailed Dr. Bellis and reported that he could not find L.M.'s file. L.M. appeared to be a candidate for amplification, and Dr. Brueggeman received medical clearance from Dr. DeSautel to fit L.M. for hearing aids. Because Dr. Brueggeman could not find L.M.'s file, the hearing aids were not ordered that day. Guse later secured hearing aids for L.M. through Starky Laboratories, Inc., a Minneapolis company.

Dr. Bellis finalized L.M.'s test results and wrote her evaluative report during the week of November 21, 2005. On November 28, 2005, Guse contacted Dr. Brueggeman because she had received L.M.'s hearing aids from

Starky Laboratories and wanted Dr. Brueggeman to fit L.M. with the appropriate gain and output. Some time prior to the e-mail that Dr. Brueggeman had sent to Dr. Bellis on November 21, 2005, Dr. Brueggeman received medical clearance from Dr. DeSautel to fit L.M. for hearing aids. The fitting did not occur because L.M. had been removed from Dr. Brueggeman's calendar for an unknown reason. Guse received Dr. Bellis's audiogram report for L.M. in the mail on November 30, 2005.

On or about December 2 or 7, 2005, students in Dr. Bellis's "Professional Issues" course completed course and faculty evaluations. Billiet served as the proctor. The evaluations included a bubble sheet and an area for handwritten comments, which were to be typed up before faculty members received the evaluations to preserve students' anonymity. Billiet collected the evaluations and was directed to deliver them to DCOM's main office. That same day, Guse learned that Dr. Bellis had the handwritten evaluations in her possession. Guse felt that USD's confidentiality policy had been violated because Dr. Bellis had personal possession of her handwritten evaluations. Guse made an appointment with Dean Olmstead for December 15, 2005, through the Dean's assistant, to discuss the situation.

On December 8, 2005, clinic faculty, including Professor Johnson and Dr. Bellis, could not find L.M.'s file. They eventually searched the student clinicians' personal files in Dr. Bellis's office and allegedly found an unauthorized copy of the rough draft of L.M.'s audiogram in Guse's student

file. They also allegedly found a fax of a medical release form dated November 17, 2005, from Dr. DeSautel's office to Dr. Brueggeman, authorizing Dr. Brueggeman to fit L.M. for hearing aids. Guse was not present for this search and denies she previously had accessed her student file because, as a first-year student, she did not handle patient files.

That same day, Dr. Bellis contacted Dean Olmstead about finding L.M.'s file in Guse's personal file, but she did not identify the student. During that conversation, Dean Olmstead told Dr. Bellis that she had an appointment with an audiology student the next week to discuss concerns over the anonymity of faculty evaluations.

A day later, on December 9, 2005, Dr. Bellis sent Dean Olmstead a nine-page memorandum discussing her allegations against Guse and her desire to have Guse dismissed from the audiology program. On December 13, 2005, Dean Olmstead, Dr. Bellis, Kurt Hackemer, Ph.D., Associate Dean of the College of Arts and Sciences, and Matthew Moen, Ph.D., Dean of the College of Arts and Sciences, met to discuss the procedures to be used to dismiss a student.

On December 15, 2005, Guse was scheduled to meet with Professor Johnson to discuss her clinic grade. Dr. Bellis also attended the meeting, even though Guse did not know that Dr. Bellis would be at the meeting. Dr. Bellis had already drafted a two-and-a-half page dismissal memorandum, handed it to Guse, told Guse she was dismissed, and collected Guse's clinic

6

keys. A security guard waited outside the meeting to escort Guse from USD's premises and recover her clinic keys if necessary.

Later that day, Guse met with Dean Olmstead for the prescheduled meeting she had set up with Dean Olmstead's assistant to discuss Guse's confidentiality concerns about Dr. Bellis. Her complaint about confidentiality, however, was not discussed and Guse and Dean Olmstead only discussed the process for Guse to follow to appeal the dismissal decision. Guse claims that she never received the opportunity to discuss Dr. Bellis's alleged confidentiality breach.

On December 16, 2005, Guse sent a six-page response to Dr. Bellis's December 15 dismissal memorandum. After considering Guse's letter, Dean Olmstead sent an official dismissal letter to Guse dated December 22, 2005. Dean Olmstead informed Guse that Dean Moen would handle the grievance procedure.

Guse submitted a written response to Dean Moen on February 9, 2009, under step one of the graduate grievance procedure. In a February 23, 2009, letter, Dean Moen upheld Guse's dismissal but recommended that the dismissal be formally removed from Guse's graduate school records. Dean Moen also provided Guse with a copy of the grievance procedure, which stated she had to file an appeal within fifteen days. On May 8, 2006, Guse e-mailed Dean Olmstead her step-two grievance letter. On May 16, 2006, Dean

Olmstead responded and notified Guse that because she failed to file her appeal within fifteen days, her time for an appeal had expired.

Guse then filed a complaint against Dr. Bellis with Robert Hakl, USD's director of the Office of Equal Opportunity and Diversity, alleging that her dismissal was in retaliation for the complaint she made against Dr. Bellis. On May 26, 2006, Hakl concluded that there was no reasonable basis to believe that Guse was subject to retaliation. Guse then filed this lawsuit.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Only disputes over facts that might affect the outcome of the case will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court views the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted).

8

Similarly, the nonmoving party receives "the benefit of all reasonable inferences to be drawn from the underlying facts" in the record. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

**DISCUSSION**

**I.    Section 1983 Claims**

Guse seeks damages for the alleged violations of her procedural and substantive due process rights and retaliation for exercising her First Amendment rights from Dean Olmstead, Dr. Bellis, and Professor Johnson in their individual and official capacities and from USD under § 1983. Section 1983 provides a civil cause of action against any person who, under color of state law, causes a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009).

**A.    Individual Capacity Claims**

In an individual capacity suit under § 1983, a plaintiff seeks to impose personal liability on a state actor for actions taken under color of state law. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978). Only state actors whose personal conduct caused the deprivation of a federal right are liable under § 1983. *Pulaski Cnty. Republican Comm. v. Pulaski Cnty. Bd. of Election Comm'rs.*, 956 F.2d 172, 174 (8th Cir. 1992) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

When a state actor is sued in her individual capacity, she can plead an affirmative defense of qualified immunity. *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009). Qualified immunity will normally shield a state actor from individual liability if her conduct occurred during the course of her state-authorized activities. *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 (1982)).

To overcome a defense of qualified immunity, the court must find: "(1) whether the facts alleged, construed in the light most favorable to the nonmoving party, establish a violation of a constitutional right, and (2) whether such right was clearly established so that a reasonable [state actor] would have known her actions were unlawful." *El-Ghazzawy v. Berthiaume*, ____ F.3d ____, No. 10-2058, 2011 WL 869599, at *3 (8th Cir. 2011) (citing *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010); *Harlow*, 457 U.S. at 818). The court has the discretion to choose which prong to analyze first. *Pearson v. Callahan*, 555 U.S. 223, ____, 129 S. Ct. 801, 821-22 (2009) (overruling the mandatory two-prong analysis established in *Saucier v. Katz*, 533 U.S. 194 (2001)).

Under the second element, "[a] plaintiff who seeks damages for a violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue." *Davis v. Scherer*, 468 U.S. 183, 197 (1984); *see also Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th

10

Cir. 2007) ("Although the defendant bears the burden of proof for this affirmative defense, the plaintiff must demonstrate that the law was clearly established." (citing *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002)). The decisive fact in the clearly established analysis is not whether the state actor's position turned out to be incorrect but rather was the question open at the time she acted. *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985). The law is clearly established if there is a Supreme Court or a Circuit Court of Appeals case on point. *Roach v. Univ. of Utah*, 968 F. Supp. 1446, 1454 (D. Utah 1997) (citing, among other cases, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

If Guse can prove that the law was clearly established, the burden shifts to defendants to show that they acted reasonably in accordance with the clearly established law. *Monroe*, 495 F.3d at 594. To make this showing:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639-40. The issue revolves around a standard of objective reasonableness because "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004); *see also Riehm v. Engelking*, 538 F.3d 952, 962 (8th Cir. 2008) ("Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " (quoting *Malley v. Briggs*, 475 U.S.

335, 341 (1986))). Accordingly, the question is "whether a reasonable [university professor] could have believed [Guse's dismissal] to be lawful, in light of clearly established law and the information [defendants] possessed. [Defendants'] subjective beliefs about the [dismissal] are irrelevant." *Anderson*, 483 U.S. at 641. This is a case-by-case determination: " 'This second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *El-Ghazzawy*, 2011 WL 869599, at *6 (quoting *Seymour v. City of Des Moines*, 519 F.3d 790, 798 (8th Cir. 2008)).

### 1.   Procedural Due Process

Guse alleges violations of her procedural due process rights. The Fourteenth Amendment protects against a state depriving an individual of her liberty or property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Before Guse can argue that USD violated her due process rights, she must identify the right at issue. *See id.*

   In their brief, defendants assume that Guse had a property interest in her continued enrollment in the audiology program. Docket 34 at 15 ("Assuming Guse had a property interest in her continued enrollment in the audiology program at USD . . . ."). In *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985), the Supreme Court "accept[ed] the University's invitation to 'assume the existence of a constitutionally protectable property right in [Ewing's] continued enrollment.' " *Id.* at 223 (quoting the oral

12

argument transcript). Similarly, the court accepts defendants' invitation to assume that Guse had a property interest in her continued enrollment in USD's audiology program that is protected by the Fourteenth Amendment.

" 'Once it is determined that due process applies, the question remains what process is due.' " *Goss v. Lopez*, 419 U.S. 565, 577 (1975) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Whether a person is entitled to due process is a question of law for the court. *Peery v. Brakke*, 826 F.2d 740, 744 (8th Cir. 1987).

In a university student's procedural due process case, the initial determination is whether the dismissal was for an academic or disciplinary reason because "far less stringent procedural requirements [are necessary] in the case of an academic dismissal." *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978). " 'Misconduct and failure to attain a standard of scholarship cannot be equated. . . . There is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals.' " *Id.* at 88 n.4 (quoting *Mahavongsanan v. Hall*, 529 F.2d 448, 449-50 (5th Cir. 1976)).

Courts typically defer to a university when it dismisses a student for academic reasons. *Ewing*, 474 U.S. at 225. Deference is given because to "determine whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Horowitz*, 435

13

U.S. at 90. Contrastingly, a court gives less deference to a university's disciplinary decision. *Id.* While a university has the "latitude and discretion" to formulate its rules and regulations and set "general standards of conduct," a student discharged for a disciplinary reason must receive "adequate notice, definite charge, and a hearing with an opportunity to present one's own side of the case and with all necessary protective measures." *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1088 (8th Cir. 1969) (citations omitted); *see also Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970) (articulating an identical standard). In *Greenhill v. Bailey*, 519 F.2d 5 (8th Cir. 1975), a case involving an academic dismissal that carried a stigma, the Eighth Circuit required "at the very least . . . an opportunity to appear personally to contest" the allegations. *Id.* at 7. In announcing that standard, the *Greenhill* court reasoned that its "holding today is not an effort to blur that distinction [between academic and disciplinary dismissals] but rather an acknowledgment that the dictates of due process, ***long recognized*** as applicable to disciplinary expulsion . . . apply in other cases as well . . . . " *Id.* at 8-9 (emphasis added). Accordingly, a student dismissed for either a disciplinary reason or an academic reason that carries a stigma should receive notice of all the allegations against her and an opportunity for an in-person hearing to present her side of the story.

Guse argues that she was dismissed for allegedly violating HIPPA and ASHA's ethical codes, and that her dismissal was discipline for these alleged

14

violations. Defendants respond that audiology students must learn to abide by HIPPA and ASHA and that Guse's failure to do so meant that she did not meet USD's academic standards; thus, her dismissal was academic.

A disciplinary dismissal is usually based on a student's misconduct. *Horowitz*, 435 U.S. at 86. It is an objective determination and not "dependent upon the analytical expertise of professional academicians." *Roth*, 408 U.S. at 569. Disciplinary decisions bear a "resemblance to traditional judicial and administrative factfinding." *Id.* When a student is compelled by a university's rule, order, or law to do something and is discharged for failing to do as ordered, the discharge is disciplinary. *Mauriello v. Univ. of Med. & Dentistry*, 781 F.2d 46, 50 (3d Cir. 1986). Disciplinary dismissals "are those involving the violation by a student of valid rules of conduct." *Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005).

Contrastingly, an academic dismissal arises from a student's failure to meet academic standards. *Horowitz*, 435 U.S. at 86. Academic dismissals usually occur when there are problems with the student's grades, an inability to perform the work, poor class attendance, or other academic failings. *Roach*, 968 F. Supp. at 1453; *see also Richmond v. Fowlkes*, 228 F.3d 854, 857-58 (8th Cir. 2000) (upholding an academic dismissal for a pharmacy student who received three negative non-cognitive evaluations when the university policy allowed dismissal after two negative evaluations); *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 253-55 (8th Cir. 1985) (upholding an academic dismissal of a

pharmacy graduate student when he failed two of his four required clerkships); *Hines v. Rinker*, 667 F.2d 699, 704 (8th Cir. 1981) (upholding an academic dismissal of a medical student after he received a failing grade in internal medicine when he had already received a prior academic dismissal).

Students' ethical violations are disciplinary violations. *See, e.g.*, *Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, 121 Fed. Appx. 515, 519 n.2 (4th Cir. 2005) (assuming that a university student accused of cheating had been dismissed for disciplinary reasons); *Nash v. Auburn Univ.*, 812 F.2d 655, 658-59 (11th Cir. 1987) (reasoning that cheating in violation of the Student Code of Professional Ethics was a disciplinary dismissal); *cf.* *Mauriello*, 781 F.2d at 50 (finding that a university student was dismissed for academic problems because the issue was on the quality of her research, not ethical violations in her research). Being accused of an ethical violation carries a stigma and threatens a person's future career prospects. *See, e.g.*, *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 311 (4th Cir. 2006) (reasoning that a university stigmatized an administrator when the university blamed him for the school's NCAA regulations' violations). "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Roth*, 408 U.S. at 573. Even in an academic dismissal, if that dismissal carries a stigma, the Eighth Circuit requires notice of all allegations

lodged against the student and the opportunity to appear in person to tell her side of the story. *Greenhill*, 519 F.2d at 7.

Guse was dismissed for her alleged ethical violations. Even though Guse received a failing grade in USD's hearing clinic, Dr. Bellis admitted that Guse's academic progress would have allowed her to continue in the program: "Academically, this student [Guse] is marginal but acceptable, and likely will 'squeak by' with a 3.0 average." Docket 53-4 at 8. According to the December 22 official dismissal letter sent to Guse from Dean Olmstead, defendants viewed Guse's expulsion as a dismissal for ethical and professional violations: "[DCOM] has recommended your dismissal . . . based on their perception that you violated ***ethical and professional standards*** of audiology by accessing certain files not in your case load." Docket 41-2 at 2 (emphasis added). In her December 15 dismissal memorandum, Dr. Bellis accused Guse of violating HIPPA, ASHA, and USD's confidentiality rules. Docket 39-4 at 2-3. In her deposition, Dr. Bellis testified that Guse had committed "an egregious violation" of professional ethics. Docket 59-1 at 5. Guse was dismissed because of her ***conduct***, not her failure to meet academic standards.

Defendants, relying on *Allahverdi v. Regents of University of New Mexico*, No. Civ. 05-277, 2006 WL 1313807 (D.N.M. Apr. 25, 2006), argue that Guse's dismissal was academic in nature because violating HIPPA and ASHA's ethical codes is an academic matter. In *Allahverdi*, the New Mexico District Court stated that an academic dismissal occurs "where a student's

scholarship or conduct reflects on the personal qualities necessary to succeed in the field in which he or she is studying and is based on an at least partially subjective appraisal of those qualities." *Id.* at *13. The facts in *Allahverdi*, however, are distinguishable. There, the university notified the student that he was being dismissed from the medical residency program because he used inappropriate langauge and he demonstrated "an inadequate medical knowledge base and clinical skills significantly below that necessary to function at a minimally acceptable level." *Id.* at *4. Thus, the grounds for dismissal were partially subjective. With regard to Guse, however, the grounds set forth in Dean Olmstead's letter are solely objective, namely that Guse "violated ethical and professional standards of audiology by accessing certain files not in [her] case load." Docket 41-2. Guse allegedly violated HIPPA and ASHA's ethical codes, which are rules of conduct. USD's reliance on *Allahverdi* and its other arguments are unpersuasive. Thus, Guse's dismissal was a disciplinary dismissal.

A university student facing a disciplinary dismissal must receive notice of all allegations against him or her, a definite charge, and an in-person hearing with the opportunity to present his or her side of the story. *Jones*, 431 F.2d 1115; *Esteban*, 415 F.2d at 1089; *Greenhill*, 519 F.2d at 7. The Supreme Court cases of *Roth*, *Horowitz*, and *Ewing* and the Eighth Circuit cases of *Esteban*, *Jones*, and *Greenhill* were decided before Guse's dismissal.

18

Thus, Guse has proven that the law regarding procedural due process was clearly established at the time of her dismissal.

### a. Dean Olmstead's Liability

Guse must now prove that the facts, when viewed in the light most favorable to her, demonstrate that Dean Olmstead deprived her of her procedural due process rights. *McRaven*, 577 F.3d at 980; *Monroe*, 495 F.3d at 594.

Regarding the notice required for a disciplinary dismissal under procedural due process, Dean Olmstead never provided Guse with notice of all the allegations against her. Guse received a copy of Dr. Bellis's December 15 memorandum, which was two-and-a-half pages long, but Guse was never provided a copy of Dr. Bellis's December 9 nine-page memorandum to Dean Olmstead. In the December 9 memorandum, Dr. Bellis made several claims that were not contained in the December 15 memorandum, including that Guse was harassing Dr. Bellis and her graduate assistant Billiet. Although Dean Olmstead was aware of these allegations, Guse did not have notice of the harassment allegations.

Dean Olmstead contends that Guse had prior notice of the claims supporting her dismissal because the clinic faculty had discussed her alleged ethical violations with her during the fall 2005 semester. Dr. Bellis testified in her deposition that she tried to reeducate Guse about the ethical codes by reminding her of the rules. But neither Dr. Bellis nor any other faculty

member ever told Guse that she was violating HIPPA or ASHA or that she would be dismissed from the audiology program if the ethical violations continued. Thus, when the facts are viewed in the light most favorable to her, Guse has alleged sufficient facts to prove that Dean Olmstead deprived her of her constitutional right to notice of the charges alleged against her.

Regarding the hearing requirement, because this is a disciplinary dismissal, Guse should have received an in-person hearing with the opportunity to present her side of the story. Dean Olmstead never gave Guse an in-person hearing. The only in-person contact Dean Olmstead had with Guse was a single meeting on December 15, 2005, when Dean Olmstead told Guse how she could contest the allegations against her by submitting a response *in writing*. Because Dean Olmstead never gave Guse a hearing or the opportunity to tell her side of the story in person, Guse has met her burden to show that Dean Olmstead deprived Guse of her constitutional right to an in-person hearing with the opportunity to present her side of the story.

The burden now shifts to Dean Olmstead to prove that a reasonable university dean could have believed Guse's dismissal was lawful in light of clearly established law on procedural due process. *Anderson*, 483 U.S. at 641. This is an objective, not subjective, determination. *Id.*

At the time of Guse's dismissal, clearly established law required that students receiving a disciplinary dismissal must be accorded written notice of all charges against them and an opportunity to respond in person. Even if the

20

differentiation between academic and procedural dismissals is a
constitutionally gray matter, when an academic decision carries a stigma,
students, at a **_minimum_**, should be notified in writing of the charges pending
against them and be given the opportunity to personally appear and contest
the allegations. _Greenhill_, 519 F.2d at 9. A seminal textbook used by higher
education administrators similarly instructs university administrators on
students' due process rights. William A. Kaplin & Barbara A. Lee, _The Law of
Higher Education_, §§ 8.1, 8.2, and 8.4 (4th ed. 2007). Furthermore, USD's
2005-2006 graduate school catalog states that "any department, **_through_**
**_due process_**, may deny a graduate student admission or continued
enrollment in a program." Docket 37 at 6 (emphasis added). A reasonable
university dean would follow the school's catalog or handbook before
dismissing a student.

Dean Olmstead argues that Guse does not allege what additional due
process would have been necessary because "Plaintiff has admitted to
accessing her patient file and copying the uncorrected audiogram. . . .
Plaintiff confirmed this fact again in her deposition testimony . . . ." Docket 58
at 4. Dean Olmstead overstates Guse's testimony. While Guse did testify that
she had twice accessed L.M.'s file without first asking Dr. Bellis, she also
testified that Billiet, who helped administer L.M.'s test and was Dr. Bellis's
graduate assistant, gave her access to L.M.'s file and told her she could copy
the file: "And then she [Billiet] said, [L.M.'s] file is in my folder, come with me,

21

I'll give you [L.M.'s] folder, you can go make a copy of whatever you want."

Docket 59-2 at 4. Billiet now denies this statement.

Additionally, Dean Olmstead did not initially agree to Guse's dismissal as Dr. Bellis acknowledged in her December 9 memorandum: "[A]lthough you [Dean Olmstead] suggested that we give this student [Guse] a 'second chance,' we feel . . . that disciplinary action should be taken immediately." Docket 39-3 at 8. Dr. Bellis[1] refused to recommend a lesser sanction even though there may not have been sufficient evidence to dismiss Guse:

> Further, we do not feel that your suggestion of having her write a paper regarding her ethical violation, although appropriate in many situations, would be appropriate or sufficient in this particular case, given that the ethical violation is only one small part of the overall concern and would not do anything to rectify the situation. . . . A failure in clinic would result in her being placed on probation for next semester, however, this would allow sufficient time for additional damage to the program to occur and would also allow for her to meet the requirements next semester and be retained in the program, allowing further opportunities to act as an instigator. . . . [W]e feel, after careful consideration, that she should be removed . . . We do feel that there is sufficient grounds, according to the Student Code of Conduct, to do so; however, we are mindful of your concern regarding grievance procedures and **wonder if we have sufficient evidence** to take such action (although it seems the clinical violation alone would suffice). . . . [W]e feel that, if not dealt with immediately, the damage done by this one student could be irrevocable.

---

[1] While Dr. Bellis used the plural "we" and "our" in the December 9 memorandum, she was the only author: "I am cc'ing this to other faculty members of the audiology faculty so that, if I have misrepresented any issue, they can correct me. I am also cc'ing this to Kurt Hackemer . . . so as to protect myself from a professional standpoint." Docket 89-3 at 1.

Docket 39-3 at 8-9 (emphasis added). Even though Dean Olmstead initially recommended lesser sanctions for Guse, such as writing a paper about her ethical violation or giving her a failing grade in the clinic course; was aware that there might not have been sufficient evidence against Guse to withstand USD's grievance procedure; and knew that USD's graduate student catalog required that students be afforded their due process rights before being dismissed, Dean Olmstead still dismissed Guse without providing Guse with a hearing to tell her side of the story. Given these facts, Dean Olmstead has not met her burden to prove that a reasonable university dean would have acted in a similar manner and, thus, summary judgment as to Dean Olmstead's individual liability under § 1983 for Guse's procedural due process claim is denied.

### b.    Dr. Bellis

Guse must show that Dr. Bellis deprived her of a constitutional or statutory right. *McRaven*, 577 F.3d at 980; *Monroe*, 495 F.3d at 594. In order to have liability under § 1983, the person against whom suit is brought must have deprived the person of a constitutional right while acting under the color of state law. 42 U.S.C. § 1983. In a § 1983 case, to have individual liability, the state actor must be ***personally involved*** in the constitutional deprivation of plaintiff's rights. *Monell,* 436 U.S. at 690-95.

Dr. Bellis and Guse dispute when Guse was dismissed. Dr. Bellis argues that Guse received notice of the allegations during the December 15

meeting that was held with Guse, Dr. Bellis, and Professor Johnson, but was not dismissed until she received Dean Olmstead's December 22 letter. Guse argues that she was dismissed during the December 15 meeting.

The exact date of when Guse was dismissed, however, is not the material issue regarding Dr. Bellis's individual liability for Guse's procedural due process claim. Instead, the issue is whether Dr. Bellis had sufficient personal involvement in the deprivation of her procedural due process rights to be held liable under § 1983.

Section "1983 liability requires personal involvement in or direct responsibility for actions resulting in [the] violation." *Carter v. Hassell*, 316 Fed. Appx. 525, 525 (8th Cir. 2008) (citing *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985)); *see also Marchant v. City of Little Rock, Ark.*, 741 F.2d 201, 204 (8th Cir. 1984) (dismissing a claim because the individual "had no knowledge or connection to" the alleged violation); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993) (dismissing a § 1983 case where a prisoner claimed that prison officials inappropriately took away his rosary because "none of the prison officials sued by him are responsible for this confiscation").

The state actor against whom a § 1983 claim is brought must have had the duty to provide the constitutional right that the plaintiff claims the actor denied her. *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 781 (8th Cir. 2001) (finding that "school districts are not susceptible to this state-created danger theory of § 1983 liability, because there is no constitutional duty of care for

24

school districts, as 'state-mandated school attendance does not . . . impose a duty upon the state.' " (quoting *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993)); *see also Davis v. Fulton Cnty., Ark.*, 90 F.3d 1346, 1352 (8th Cir. 1996) (reasoning that "[t]he record was insufficient, however, to make out a constitutional duty to protect" the plaintiff); *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 393 (8th Cir. 2007) (reasoning that in order for municipality officials to be held liable under § 1983, they must have had a " 'clear constitutional duty' " (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 396-97 (1989) (O'Connor, J., concurring in part and dissenting in part))).

Dr. Bellis recommended Guse's dismissal to Dean Olmstead and Dr. Bellis served as a member of the discipline committee. While the department or the program could recommend dismissal of a USD student, the graduate dean was the person who had the authority to formally dismiss the student from the graduate school. Dean Olmstead Dep., Docket 42-2 at 6. Dr. Bellis was not the person who had the official duty to provide Guse with notice of all the claims alleged against her or to provide her with an in-person hearing and the opportunity to present her side of the story. That duty rested solely with Dean Olmstead, the individual with the power to dismiss Guse. Guse has not identified any case law, either by the Supreme Court or the Eighth Circuit Court of Appeals, where a professor who was not the final decisionmaker was held liable for a procedural due process violation. Thus,

summary judgment on Guse's procedural due process claim against Dr. Bellis in her individual capacity is granted.

### c.    Professor Johnson

Professor Johnson was director of USD's hearing clinic for the fall 2005 semester. Professor Johnson failed Guse in the hearing clinic course and scheduled a meeting with Guse on December 15 to discuss the failing clinic grade. But Guse's failing clinic grade did not factor into her dismissal and it is undisputed that Guse would not have been dismissed solely for that grade.

The facts, viewed in the light most favorable to Guse, only show that Professor Johnson discussed Guse's failing clinic grade and how Guse could remedy the situation because graduate audiology students are required to complete twenty-five hours in the hearing clinic during their first year. Besides arranging the December 15 meeting and allowing Dr. Bellis to attend the meeting, nothing in the facts show that Professor Johnson had any other personal conduct that denied Guse her procedural due process rights. Consequently, summary judgment is granted as to Professor Johnson's individual liability on Guse's procedural due process claim.

### 2.    Substantive Due Process

Substantive due process requires a university student objecting to a dismissal from school to make a two-part showing: (1) that she had a property or liberty interest; and (2) there was no rational basis for the adverse decision. *Disea v. St. Louis Cmty. Coll.*, 79 F.3d 92, 95-96 (8th Cir. 1996). Defendants

26

again assume that Guse had a property or liberty interest in her continued enrollment in USD's audiology program, so the first prong is met.

Under the second prong, "[f]or a court to overturn a student's dismissal on substantive grounds it must find that such dismissal was arbitrary and capricious." *Greenhill*, 519 F.2d at 10 n.2. "To establish such arbitrary and capricious action, the plaintiff must show that there is no rational basis for the university's decision, or that the decision to dismiss was motivated by bad faith or ill will unrelated to academic performance." *Hines*, 667 F.2d at 703 (internal citations omitted). This standard is narrow, *Ewing*, 474 U.S. at 227, and applies to both academic and disciplinary dismissals. *Moore v. Parks*, No. 96-56650, 1998 WL 123131, at *2 (9th Cir. Mar. 17, 1998) (citing *Ewing*, 474 U.S. at 224-25).

To show that a university's decision to dismiss a student was arbitrary and capricious, a student can show either that the university handled her case differently than other students' cases or that the university's decision was not careful and deliberate. *Schuler v. Univ. of Minn.*, 788 F.2d 510, 516 (8th Cir. 1986). Guse has only argued that defendants' decision to dismiss her was not careful and deliberate.

Under the careful and deliberate standard, "a court's role is limited to examining the record of University proceedings to determine whether there was substantial evidence to support its determination." *Agarwal v. Regents of*

*the Univ. of Minn.*, 788 F.2d 504, 508 (8th Cir. 1986) (citing *Wood v. Strickland*, 420 U.S. 308, 325-26 (1975)).

Courts generally deny a university student's substantive due process claim because the university usually conducted a thorough investigation before dismissing the student and followed its established dismissal procedures. *See, e.g.*, *Ewing*, 474 U.S. at 227 (finding that a dismissal of a medical student who failed a set of medical boards did not violate the student's substantive due process because the student received a hearing and his record revealed several low grades, seven incomplete grades, and the student often had a reduced course load); *Ikpeazu*, 775 F.2d at 253-54 (reasoning that the university did not violate a pharmacy student's substantive due process rights when the student handbook provided for dismissal for the student's conduct, the professors tried to help the student with his academic difficulties, and the student participated in several hearings about the matter); *see also Seal v. Morgan*, 229 F.3d 567, 579 (8th Cir. 2000) (holding that even though a school board afforded the student a number of hearings, the student's substantive due process rights were violated because the board did not complete a full factual investigation); *Lee v. Macon Cnty. Bd. of Educ.*, 490 F.2d 458, 460 (5th Cir. 1974) (reasoning that in the case of high school student's expulsion that "[f]ormalistic acceptance or ratification of the principal's request or recommendation as to the scope of punishment, without independent [School] Board consideration of what,

28

under all the circumstances, the penalty should be, is less than full due process."). Guse has met her burden to show that Supreme Court and Eighth Circuit precedent on substantive due process at the time of her dismissal was clearly established.

### a.    Dean Olmstead

Guse must show that Dean Olmstead deprived her of her substantive due process right that she be dismissed in a careful and deliberate manner. *McRaven*, 577 F.3d at 980; *Monroe*, 495 F.3d at 594.

This case presents unique factual circumstances from the majority of cases because Dean Olmstead failed to conduct ***any*** investigation before dismissing Guse. Instead, Dean Olmstead only reviewed the facts as presented to her by Dr. Bellis and Guse and gave Dr. Bellis more opportunities to bring allegations against Guse than she provided to Guse to defend herself. Dean Olmstead learned about Dr. Bellis's side of the story through a phone conversation on December 8 and two written memorandums from Dr. Bellis dated December 9 and 15. Contrastingly, Dean Olmstead only had one conversation with Guse, which was limited to the process Guse should use to respond to Dr. Bellis's December 15 memorandum. Dean Olmstead also reviewed Guse's response letter dated December 16, which only addressed the allegations contained in Dr. Bellis's December 15 memorandum and not Dr. Bellis's December 9 memorandum.

29

Dean Olmstead never conducted an independent investigation of any of the facts surrounding Guse's dismissal or otherwise ensured that her decision to dismiss Guse was careful and deliberate, even though Dr. Bellis admitted that the evidence might not support Guse's dismissal. When the facts are viewed in the light most favorable to her, Guse has proven that substantial evidence did not support Dean Olmstead's decision to dismiss Guse, in violation of the Fourteenth Amendment's substantive due process requirements.

The burden now shifts to Dean Olmstead to show that she acted reasonably in conformance with the clearly established law. Dean Olmstead argues that she provided Guse all aspects of due process and "Guse's complaints are essentially one of disagreement with [Dean] Olmstead's ultimate decision to dismiss Guse from the Graduate School. There is no constitutional right that required [Dean] Olmstead to find in Guse's favor." Docket 37 at 6. Dean Olmstead makes no argument as to how she acted as a reasonable university dean regarding Guse's substantive due process rights. As stated in the cases cited above, when a university dean (or other university employee with the power to dismiss a student) decides to dismiss a student, that decision is usually upheld by the court because the dean conducted an independent investigation and afforded the student her full procedural due process rights. Dean Olmstead neither conducted an independent investigation nor accorded Guse all of her procedural due process rights.

30

Accordingly, Dean Olmstead has not met her burden of proof and summary judgment as to Dean Olmstead's individual liability on Guse's substantive due process claim is denied.

### b.    Dr. Bellis

Guse must show that Dr. Bellis deprived her of her substantive due process rights. While Dr. Bellis drafted the dismissal memorandums, she had no authority to dismiss Guse from USD's audiology program. Consequently, she had no duty to provide Guse with her substantive due process rights and had insufficient personal conduct to be held liable under § 1983. Summary judgment as to Dr. Bellis's individual liability on Guse's substantive due process claim is granted.

### c.    Professor Johnson

Professor Johnson gave Guse a failing grade for the clinic course, but this failing grade did not cause Guse to be dismissed from the audiology program. Professor Johnson had no personal conduct regarding Guse's substantive due process rights that would subject her to liability. Because Guse has not alleged facts to show how Professor Johnson deprived her of her substantive due process rights, summary judgment on Professor Johnson's individual liability for the substantive due process claim is granted.

### 3.    First Amendment Retaliation

Guse alleges that she was dismissed in retaliation for exercising her First Amendment rights, namely because she complained that Dr. Bellis had

31

personal possession of the students' handwritten evaluations in violation of USD's confidentiality policy. Defendants respond that Guse's dismissal was for academic reasons.

A plaintiff must make a two-part showing for a First Amendment retaliation claim: (1) that the student's conduct was protected by the First Amendment; and (2) that this conduct was a substantial or motivating factor in the adverse decision. *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 278 (1977); *see also Henderson v. Huecker*, 744 F.2d 640, 643 (8th Cir. 1984) (articulating a similar test). After the plaintiff makes this showing, the defendant has the burden to show by a preponderance of the evidence that it would have reached the same decision in the absence of the protected conduct. *Doyle*, 429 U.S. at 278.

Under the first prong, the First Amendment protects an individual's freedom of speech and is binding on the states through the Fourteenth Amendment. *Healy v. James*, 408 U.S. 169, 181 (1972). Guse's complaint is considered speech under the First Amendment because she intended to convey a message, *see, e.g., Tindle v. Caudell*, 56 F.3d 966, 969 (8th Cir. 1995) (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989)), namely that she believed that Dr. Bellis violated USD's confidentiality policy by having possession of the handwritten evaluations. In the First Amendment realm, the court "is the final arbiter of the question whether a public university has exceeded constitutional constraints, and [the court] owe[s] no deference to

32

[the] university when [it] consider[s] that question." *Christian Legal Soc. v. Martinez*, 130 S. Ct. 2971, 2988 (2010).

While the Supreme Court has not always engaged in a forum analysis when determining whether a university violated a student's First Amendment rights, *see Papish v. Board of Curators of University of Missouri*, 410 U.S. 667, 670-71 (1973); *Healy*, 408 U.S. at 180, the Court recently conducted a forum analysis in *Rosenberger v. Rector & Visitors of the University of Virigina*, 515 U.S. 819 (1995). There are different types of forums for purposes of the First Amendment. A traditional public forum is generally open to all protected speech. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) ("Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.' " (citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983))). Examples of traditional public fora include streets and parks. *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981). A designated public forum is "created by purposeful governmental action." *Forbes*, 523 U.S. at 677. A designated forum can be open, where the government must allow all forms of protected speech. *See id.* A designated forum can also be limited, meaning that the government has designated the content or subject matter of the forum: "The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for . . . the discussion of certain

33

topics." *Rosenberger*, 515 U.S. at 829 (citations omitted). A limited forum
need not be a physical place and can be a metaphysical forum. *Id.* at 830.
Once the state creates the limited forum, it "may not exclude speech where its
distinction is not 'reasonable in light of the purpose served by the forum.' " *Id.*
at 829 (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S.
788, 806 (1985)).

Here, USD created a limited forum by allowing audiology students to
contact Dean Olmstead to complain about professors. Dean Olmstead's
assistant scheduled an appointment for Guse with Dean Olmstead so that
Dean Olmstead and Guse could discuss Guse's concerns. Defendants do not
dispute that USD created a limited forum. Because Guse used the established
channels to speak about her concerns that Dr. Bellis allegedly violated USD's
confidentiality policy, her speech is protected by the First Amendment.

Defendants contend that because Guse's speech does not touch a
matter of public concern as set out in *Pickering v. Board of Education*, 391
U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983), it is not protected
speech. Courts apply the public concern test for employees at public
universities and colleges. *See, e.g.*, *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir.
2002); *Schilcher v. Univ. of Ark.*, 387 F.3d 959, 966 (8th Cir. 2004).

But in the context of public university students, the Supreme Court
has not applied the public concern test. *See, e.g.*, *Papish*, 410 U.S. at 670 (in
holding that a university cannot punish a student because it disapproved of

the content of the student's speech, the Supreme Court never invoked *Pickering* or *Connick* in its analysis); *Rosenberger*, 515 U.S. at 829-30 (similar). Instead, as cited above, the Court has recently engaged in a forum analysis and has found that if a student's speech was within the subject matter of the limited forum, then the university was prohibited from discriminating against the student based on the content of the speech or the viewpoint expressed in the speech. *Rosenberger*, 515 U.S. at 829-30.

The district court for the Northern District of Illinois has similarly reasoned that the public concern test does not apply in the case of a university graduate student: "In the court's opinion, the absence of a reported case directly on point demonstrates nothing more than widespread compliance with the well-recognized constitutional principles of *Tinker*, *Healy*, *Papish* and the like." *Qvyjt v. Lin*, 953 F. Supp. 244, 249 (N.D. Ill. 1997) (citing *Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994)). The *Qvyjt* court reasoned that "it was clearly established by no later than 1973, when the Supreme Court decided *Papish*, that state university officials cannot retaliate or punish a graduate student for the content of his speech, regardless of whether that speech touches [a] matter of public or private concern." *Id.*

In the alternative, if Guse had to show that her speech touched a matter of public concern, she has made this showing. "A matter of public concern is a matter of political, social or other concern to the community. To determine whether speech qualifies as a matter of public concern, [the court]

35

must examine the content, form and context of the speech, as revealed by the whole record." *Sparr*, 306 F.3d at 594 (citing *Connick*, 461 U.S. at 146-48). Essentially the court determines whether the "purpose of the speech was to raise issues of public concern or to further the [speaker's] private interests." *Id.* The Eighth Circuit has reasoned that a university employee who complains about university corruption has engaged in speech that touches a matter of concern. *See Schilcher*, 387 F.3d at 966 ("The content of [the plaintiff's] speech (including concerns about corruption and misuse of public funds, curricular deficiencies, and discrimination against persons other than herself) . . . give rise to an inference that she was speaking as a concerned citizen."); *see also Coats v. Pierre*, 890 F.2d 728, 732 (5th Cir. 1989) (reasoning that "because of assertions by him that professors . . . showed favoritism in grading," the professor's speech touched a matter of public concern).

Guse's allegations that Dr. Bellis had possession of students' handwritten evaluations in violation of USD's confidentiality policy would touch a matter of public concern because her complaint goes beyond her own personal interests and reaches the broader community of audiology students. Accordingly, Guse's speech is protected by the First Amendment and prong one of the retaliation test is met.

Under the second prong, if the plaintiff establishes a causal connection between the protected activity and the adverse decision, she has met her

36

burden on a summary judgment motion. *Altonen v. City of Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007). A temporal connection is strong evidence of a causal connection and one incident of an adverse action following a protected activity can be sufficient, even though temporal proximity alone generally is insufficient to establish a causal connection. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). "Evidence that gives rise to an 'inference of retaliatory motive' is sufficient to prove a causal link between the speech and the adverse action." *Altonen*, 487 F.3d at 560 (citing *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002)). Guse has met her burden to show that her speech was protected speech and that the two-prong retaliation test was clearly established before her dismissal.

### a.    Dr. Bellis

Guse must show that she was dismissed because she exercised her First Amendment rights. On December 2 or 7, 2005, Guse and other students in Dr. Bellis's "Professional Issues" course completed confidential course and faculty evaluations that included a handwritten section. Billiet served as the proctor and was supposed to deliver the completed evaluations to a secretary so she could type up the handwritten sections to preserve students' anonymity. But that same day, Guse learned that Dr. Bellis had the handwritten evaluations in her possession, which would be a breach of USD's confidentiality policy.

37

On December 2 or 7, 2005, Guse contacted Dean Olmstead's office to discuss the situation. Dean Olmstead was not available, but Dean Olmstead's assistant recorded that an audiology student was concerned about a breach of USD's confidentiality policy involving Dr. Bellis having possession of the handwritten student evaluations, and the assistant scheduled a meeting for December 15, 2005, between Guse and Dean Olmstead. On December 8, 2005, Dr. Bellis and Dean Olmstead had a telephone conversation where Dr. Bellis stated that a student had improperly copied a patient's file and engaged in other behavior that violated the ethical codes. In that conversation, Dean Olmstead also told Dr. Bellis that a student had complained about Dr. Bellis regarding the evaluation procedure. Dr. Bellis referred to a student of concern, "SG," in her December 9 follow-up memorandum to Dean Olmstead. In the December 9 memorandum, while Dr. Bellis never identified Guse by name, Dr. Bellis stated that the same student who allegedly violated ASHA and HIPPA also made a complaint that Dr. Bellis breached USD's confidentiality policy. Dr. Bellis knew that Guse was the student accused of violating ASHA and HIPPA because Dr. Bellis made the allegations against Guse.

In the December 9 memorandum, Dr. Bellis appeared upset by the allegations against her: "I am, of course, appalled that such professional misconduct would be alleged . . . On a more personal note, I am very upset and angry on behalf of myself and my faculty . . . [we] are being forced to

watch ourselves." Docket 39-3 at 6, 9. Dr. Bellis further stated that Guse had turned other students against her: "In addition, we are reasonably certain that she has been successful in rallying support from a small cohort of other students, particularly against me. . . . I am relatively sure that the student evaluations in question will reflect the views of this cohort as that would certainly explain the whole 'tampering with student evaluations' concern." Docket 39-3 at 7.

Dr. Bellis summarized her view on the situation: "In short, we need to deal with this situation immediately. I fully expect additional allegations of wrongdoing . . . . Nonetheless, I am concerned that my own professional reputation and good standing, as well as the program as a whole, has been and will continue to be damaged by this situation." Docket 39-3 at 8. Dr. Bellis also refuted Dean Olmstead's suggestion to show Guse leniency: "Further, although you suggested that we give this student a 'second chance,' we feel that she has exhibited a pattern of behavior that is in violation of several components of the Student Code of Conduct." Docket 39-3 at 8. Dr. Bellis did not agree with Dean Olmstead that simply failing Guse in the clinical course would be sufficient discipline because "this would allow sufficient time for additional damage to the program to occur . . . allowing further opportunities to act as an instigator." Docket 39-3 at 8. Accordingly, Dr. Bellis recommended that Guse "be removed so as to prevent any further harm to our program, our own reputations, and our other students." Docket

39-3 at 8. Dr. Bellis ended with "I hope for your full support in this matter." Docket 39-3 at 9.

The December 9 memorandum was the first written document suggesting Guse be dismissed from USD. In this memorandum, Dr. Bellis intertwined Guse's alleged ethical violations with the damage that Guse had allegedly done to Dr. Bellis by exercising her First Amendment rights to complain about Dr. Bellis's possession of the evaluations. Because Dr. Bellis wrote to Dean Olmstead recommending Guse's dismissal in the same letter where Dr. Bellis was upset about the breach of confidentiality allegation, the evidence tends to show a retaliatory motive by Dr. Bellis against Guse. Moreover, Guse has established a causal connection by the temporal proximity of her protected activity that occurred on December 2 or 7, Dr. Bellis's letter recommending dismissal on December 9, Dr. Bellis's dismissal memorandum dated December 15, the day she was supposed to discuss Dr. Bellis's confidentiality breach with Dean Olmstead, and Dean Olmstead's official dismissal on December 22. Accordingly, Guse has alleged sufficient facts to give rise to an inference of retaliatory motive and, thus, has met her prima facie burden.

The burden now shifts to Dr. Bellis to show that she would have recommended Guse's dismissal even if she had not exercised her First Amendment rights. Dr. Bellis argues that Guse cannot now claim that she was dismissed for complaining about her, because Guse admitted that

40

Dr. Bellis told Guse that she could not have a rough draft copy of L.M.'s audiogram. Further, Dr. Bellis stated that she had growing concerns about Guse's ethical violations after L.M.'s appointment on November 1, 2005.

Even if Dr. Bellis told Guse that she could not have a copy of L.M.'s incomplete audiogram, Guse has alleged facts that Billiet told Guse she could copy L.M.'s file. While Dr. Bellis expressed concerns about Guse to Dr. Brueggeman in an e-mail prior to November 1, there is no documentation about Dr. Bellis's concerns in Guse's student file or in any formal writing until Dr. Bellis's December 9 memorandum, which was written after Guse exercised her First Amendment rights by lodging a complaint against Dr. Bellis. And after Dean Olmstead recommended a sanction less than dismissal, Dr. Bellis countered that dismissal was necessary while also expressing personal insult at Guse's complaint. Accordingly, viewing the evidence in the light most favorable to Guse, Dr. Bellis has not shown that she would have taken the same action if Guse had not exercised her First Amendment rights and, therefore, Guse has met her burden to show that Dr. Bellis deprived Guse of her First Amendment rights.

Dr. Bellis contends that she is protected by qualified immunity because she "did not make the decision to dismiss Guse from the program." Docket 37 at 5. Courts have denied qualified immunity when faculty members violate a student's First Amendment rights. In *Qvyjt v. Lin*, 953 F. Supp. 244 (N.D. Ill. 1997), a graduate student brought suit against three professors in his

41

university's chemistry department alleging that the professors misappropriated his research and when he complained, retaliated against him in violation of the First Amendment. *Id.* at 245. The alleged retaliation included prohibiting the student from using the chemistry laboratory and the committee's refusal to find the student's dissertation sufficient to fulfill his program requirements. *Id.* at 246. The court denied a motion for summary judgment on the professors' qualified immunity defense because "state university officials cannot retaliate or punish a graduate student for the content of his speech." *Id.* at 248-49. In *Davis v. Goode*, 995 F. Supp. 82 (E.D.N.Y. 1998), the student alleged that some faculty members retaliated against him by giving him low grades after he exercised his First Amendment rights by writing articles in a law student newspaper criticizing a professor's grading system. *Id.* at 85. The court denied summary judgment on the professors' qualified immunity claims because the court found that all of the professors had sufficient personal conduct to be held liable under § 1983. *Id.* at 88.

Dr. Bellis had personal involvement in denying Guse her First Amendment rights because she recommended Guse's dismissal after Guse complained to Dean Olmstead that Dr. Bellis had possession of the students' handwritten evaluations. A recommendation for dismissal from a graduate program is a punishment and a form of retaliation. As explained above, Dr. Bellis intertwined her concern over Guse's protected First Amendment

42

activity with Guse's alleged ethical violations in her December 9

memorandum. Because Dr. Bellis has not shown that she recommended

dismissal solely for Guse's alleged violation of ASHA and HIPPA ethics, she is

not entitled to qualified immunity on the First Amendment retaliation claim.

### b. Dean Olmstead

Dean Olmstead contends that she was a neutral party who considered

all the evidence and then decided to dismiss Guse. But Dean Olmstead, as a

supervisor, had direct participation in denying Guse her First Amendment

rights, which is sufficient personal conduct for a supervisor to be held liable

under § 1983:

> A supervisor cannot be held liable for an employee's
> unconstitutional actions based on a theory of respondeat
> superior. Rather, a supervisor incurs liability for a violation of a
> federally protected right when the supervisor is personally
> involved in the violation or when the supervisor's corrective
> inaction constitutes deliberate indifference toward the violation.
> The supervisor must know about the conduct and facilitate it,
> approve it, condone it, or turn a blind eye for fear of what [he or
> she] might see.

*Ottman v. City of Independence*, 341 F.3d 751, 761 (8th Cir. 2003) (alteration

in original) (citation and internal quotations omitted). "[A] supervisor can act

with 'deliberate, reckless indifference' even when he does not act

'knowingly.' " *Kahle v. Leonard*, 477 F.3d 544, 551-52 (8th Cir. 2007). "A

supervisor can be found liable under § 1983 for deliberate indifference if he is

aware of 'a substantial risk of serious harm,' even if he is not aware that the

harm has, in fact, occurred." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825,

842 (1994)). But a supervisor " 'is only liable for his . . . own misconduct' and is not 'accountable for the misdeeds of [his] agents' under a theory such as respondeat superior or supervisor liability." *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). " 'A supervisor may be held individually liable under § 1983 if [s]he directly participates in the constitutional violation . . . .' " *Riehm v. Engelking*, 538 F.3d 952, 962-63 (8th Cir. 2008) (alterations in original) (quoting *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007)).

After Dean Olmstead initially discussed Dr. Bellis's concerns about Guse in a telephone conversation on December 8, Dean Olmstead received a memorandum from Dr. Bellis on December 9 that recommended Guse's dismissal. As stated above, Dr. Bellis intertwined her own personal insult at Guse's comments about her professionalism into her recommendation for dismissal. But Dr. Bellis also argued that Guse's complaint about the evaluations could irrevocably jeopardize the brand new graduate audiology program if Dean Olmstead did not dismiss Guse:

> [S]he [Guse] maintained that a prominent evaluator had run into her at Sam's club and told her that the diagnosis was wrong. Not only would this have been an ethical violation of the highest order for that person, but we were also certain that this incident had not occurred . . . . As a result we were ***very concerned that our own results and recommendations be portrayed accurately and clearly***. . . . Although we do not have direct evidence of what was said at these outside meetings with other professionals, her misrepresentations within the department and her use of unauthorized and non-final results raise significant concern regarding possible statements that have the potential to do

damage to . . . the ***reputation of our clinic***. . . . I went to Kurt Hackemer to discuss the issue as well as myriad additional concerns regarding this student that were having a ***detrimental effect on our program*** and students as a whole. He suggested that it seemed we need to take care of this student and situation immediately as this appeared to be an emergency . . . We can say, however, that the ***morale of the entire program*** has been significantly and adversely affected . . . In short we need to deal with this situation immediately. . . Nonetheless, I am concerned that my own professional reputation and good standing***, as well as the program as a whole***, has been and will continue to be damaged by this situation. . . . A failure in clinic would result in her being placed on probation for next semester, however, this would allow sufficient time for ***additional damage to the program to occur*** . . . she should be removed so as to ***prevent any further harm to our program*** . . . I am very upset and angry on behalf of myself and my faculty that, after all of the ***hard work we have all put into making this AuD launch a success*** and the vast amount of time and energy we expend in doing the best job we possibly can, we are placed in this position and are being forced to watch ourselves and ***our program undermined and decimated*** in this manner. . . . Several of our students are miserable over this and the ***morale of the entire program*** has been impacted. . . . the ***damage done by this one student could be irrevocable***.

Docket 39-3 at 1-9 (emphasis added).

Dr. Bellis also repeatedly stated that Dean Olmstead might not have sufficient evidence to dismiss Guse. Regarding whether Guse copied L.M.'s file without authorization, Dr. Bellis stated that: "I was unable to confront her about this issue as (1) I had ***no direct evidence*** the incident had occurred, and (2) the GA [Graduate Assistant] requested that I protect her as she was wary of reprisals." Docket 39-3 at 3 (emphasis added). Dr. Bellis admits that there is little objective evidence to support many of the claims she alleged against Guse:

The situation involving the unauthorized access and use of patient files above was but one incident, and **one of the few for which we have objective evidence**. However, there has been a pattern through the semester (and a past history) of this student's behavior in terms of divisiveness, harassment of other students, and targeting of faculty members. Unfortunately, **most of this information has come to us through student report, so [it] is hearsay**. We also have received report that this student engaged in the same conduct at her previous institution, Augustana, where she expressed intent to "take a faculty member down" due to her dissatisfaction with the faculty member's management of her family members clinical case (the precise same situation here). Again, **hearsay, but if an investigation is necessary**, the students who witnessed these events directly could be subpoenaed to testify, as could faculty members at Augustana, I would think, if they were aware of the situation. In addition, we are **reasonably certain** that she has been successful in rallying support from a small cohort of other students, particularly against me. . . . **We believe, although we cannot substantiate this**, that these two issues [termination of a secretary and the evaluations concern] have allowed SG to garner some support from a small cohort of other students to target me specifically. **We further suspect**, given past history, that the initial incident that led to this was my (and subsequently Paul's [Dr. Brueggeman's]) refusal on ethical grounds to provide improper interventions for her family members. Of course, the vast majority of this information has come to us via ongoing voluntary reports by students warning us of the situation and requesting that we intervene and **we have very little objective evidence of any of this** with the exception of the specific documentation cited above. . . . Given the substantial concerns about this student, her past history (**albeit unsubstantiated** at present) of similarly targeting faculty members at another institution . . . we feel, after careful consideration, that she should be removed . . . We do feel that there is sufficient grounds . . . however, we are mindful of your concerns regarding grievance procedures and **wonder if we have sufficient evidence** to take such action (although it seems the clinical violation alone would suffice).

Docket 39-3 at 7-8 (emphasis added).

Dean Olmstead is the Associate Vice President for Academic Affairs and Dean of Graduate Education. Docket 38 at ¶ 36. Dean Olmstead was Dr. Bellis's supervisor and Dean Olmstead, not Dr. Bellis, retained the sole authority to dismiss Guse. *See, e.g.*, Dean Olmstead's Dep., Docket 42-2 at 6 (testifying that "[t]he department or the program would recommend dismissal of the student to the graduate school, and then based on that recommendation the graduate Dean would dismiss the student from the graduate school formally . . . .").

Because Dean Olmstead failed to conduct an independent investigation before dismissing Guse, the only evidence available to her before she made her decision to dismiss Guse were the written materials submitted to her, including Dr. Bellis's December 9 and 15 memorandums and Guse's response to the December 15 memorandum. Dean Olmstead knew that the December 9 memorandum alleged that Dr. Bellis believed that Guse had put the new audiology graduate program in jeopardy of being irrevocably damaged because Guse raised the complaint about Dr. Bellis. Dean Olmstead also knew from the December 9 memorandum that Dr. Bellis did not have objective evidence for the majority of the allegations alleged against Guse.

Dean Olmstead directly participated in retaliating against Guse for exercising her First Amendment rights. After reading the December 9 memorandum, Dean Olmstead should have known that there was insufficient evidence to dismiss Guse for the claims alleged against her by Dr. Bellis.

47

Dean Olmstead condoned Dr. Bellis's behavior by dismissing Guse even though Dean Olmstead knew that Dr. Bellis was upset that Guse had complained about her. In the December 8 telephone conversation, Dean Olmstead initially recommended a lesser sanction for Guse, such as failing the clinic course or writing a paper on ethics. But after reading the December 9 memorandum which stated that the audiology program could be irrevocably damaged from Guse's conduct of engaging in First Amendment protected activity by complaining about Dr. Bellis, Dean Olmstead dismissed Guse. Dean Olmstead's actions show that she acted with deliberate indifference to Guse's First Amendment rights and that she directly participated in retaliating against Guse for exercising her First Amendment rights. Guse has alleged sufficient facts to show that the exercise of her First Amendment rights was a motivating factor in Dean Olmstead dismissing her and, thus, Guse has met her burden to show that Dean Olmstead is not protected by qualified immunity.

The burden now shifts to Dean Olmstead to show that a reasonable university dean would have thought that her actions were in accordance with the clearly established law. Given the concerns stated above with Dr. Bellis's December 9 memorandum and Dean Olmstead's failure to conduct an independent investigation, Dean Olmstead has not shown that a reasonable university dean would have acted in a similar matter. Accordingly, summary

48

judgment as to Dean Olmstead's individual liability on Guse's First Amendment retaliation claim is denied.

### c.    Professor Johnson

Professor Johnson had insufficient personal conduct to be held liable under § 1983 for Guse's First Amendment retaliation claim. It is not clear from the record if Professor Johnson even knew that Guse complained about Dr. Bellis having possession of the evaluations because Professor Johnson was not involved in Guse's dismissal. Consequently, summary judgment as to Professor Johnson's individual liability on the First Amendment retaliation claim is granted.

### B.    Official Capacity Claims

Guse also seeks damages from USD and from Dean Olmstead, Dr. Bellis, and Professor Johnson in their official capacities. "Suits against state officials in their official capacity . . . should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of the federal law.' " *Id.* (quoting *Graham*, 473 U.S. at 166).

USD's official policy is that a student should be afforded due process rights before she is dismissed from school. On her due process claims, Guse has not alleged that USD's official policy of affording a student due process

rights before dismissal caused her injury. On the First Amendment retaliation claim, Guse has not alleged that USD has a custom or official policy that played a role in depriving her of her First Amendment rights. Because Guse has not met her burden, summary judgment on the official liability claims against Dean Olmstead, Dr. Bellis, and Professor Johnson and against USD is granted.

## II.    Breach of Contract

Defendants argue that because Guse failed to establish her procedural due process claim, that her contract claim must also fail. Because summary judgment is denied on the procedural due process claim as to Dean Olmstead and defendants offer no further argument, summary judgment is denied on the breach of contract claim.

## III.    Negligent Infliction of Emotional Distress

Guse seeks damages from defendants resulting from their negligent infliction of emotional distress. Defendants' only argument is that "Guse's remaining claim of negligent infliction of emotional distress be dismissed for lack of jurisdiction." Docket 34 at 25.

Diversity jurisdiction requires complete diversity of all the parties and an amount in controversy over $75,000. 28 U.S.C. § 1332. Guse alleges that she is a resident of North Carolina and that all defendants are residents of South Dakota and she seeks more than $75,000 in damages. Thus, she has met the requirements of diversity jurisdiction.

50

The court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367, which provides that the court has supplemental jurisdiction over claims that form part of the same case or controversy as the claims giving the court original jurisdiction. The state and federal claims must " 'derive from a common nucleus of operative fact.' " *McRaven*, 577 F.3d at 984 (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). All of Guse's claims arise out of USD's dismissal of Guse from the audiology program and derive from the same nucleus of operative facts. Accordingly, the court has supplemental jurisdiction over Guse's state-law claim of negligent infliction of emotional distress. Because defendants make no other argument on this claim, summary judgment is denied on the negligent infliction of emotional distress claim.

## IV.    Punitive Damages

Guse also seeks punitive damages from defendants. Defendants generally move for summary judgment on all of Guse's claims but do not specify why punitive damages are inappropriate. Because summary judgment is denied on several of Guse's claims and punitive damages are potentially available as relief, summary judgment on the request for punitive damages is denied.

## CONCLUSION

Defendants move for summary judgment on all claims. Summary judgment is denied on Dean Olmstead's individual liability for Guse's

51

procedural and substantive due process claims and on the First Amendment retaliation claim. Summary judgment as to Dr. Bellis's individual liability on the procedural and substantive due process claims is granted but denied on the First Amendment retaliation claim. Summary judgment is granted on Professor Johnson's individual liability on all claims. Summary judgment is also granted on Dean Olmstead's, Dr. Bellis's, and Professor Johnson's official liability claims. Summary judgment is granted to USD on the § 1983 claims. Summary judgment is denied to all defendants on the breach of contract, negligent infliction of emotional distress, and punitive damages claims. Accordingly, it is

ORDERED that the defendants' summary judgment motion (Docket 33) is denied and defendants' summary judgment motion based on qualified immunity (Docket 36) is granted in part and denied in part.

Dated March 30, 2011.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE